# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-KA-00154-COA

**CHRISTOPHER CARMEL BURDINE A/K/A**　　　　　　　　**APPELLANT**
**CHRISTOPHER BURDINE**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/04/2024 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | JOE HEMLEBEN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | ANGEL MYERS McILRATH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/07/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Christopher Burdine appeals his conviction by a Jackson County Circuit Court jury of two felony counts of voyeurism for filming women in restrooms without permission (Counts 1 and 2) for which the court sentenced him as a habitual offender to two terms of life imprisonment without parole eligibility. The jury also found Burdine guilty of three misdemeanor counts of indecent exposure (Counts 3-5) for which he was sentenced to serve six months in custody for each conviction. All sentences were to be served concurrently in the custody of the Mississippi Department of Corrections. On appeal, Burdine argues that

the State failed to establish proper venue and the elements needed for habitual offender treatment, that the circuit court improperly admitted evidence, and that his life sentences were unconstitutionally disproportionate to his crimes. Having reviewed the record, the arguments of counsel, and relevant precedent, we affirm Burdine's convictions and sentences.

**Facts**

*The Incidents*

¶2.    Between January 4, 2023, and January 11, 2023, three teenage girls separately reported to the Jackson County Sheriff's Office that a man driving a white pickup truck in the St. Martin community exposed himself to them. First was fourteen-year-old A.V.,[1] who told officers that as she was walking home from being dropped off by the school bus, a white male in a white truck pulled up beside her and asked her for directions to her high school. When she looked over, he had his penis exposed and he was fondling it while talking to her. He then laughed and drove away.

¶3.    A few days later, thirteen-year-old L.V. told officers that a white male in a white truck pulled up next to her as she was walking home from the store in the same community. The man asked her about her school, and when she looked over at him in the truck, he was masturbating. L.V. described him as wearing a blue shirt and having brown, shaggy hair and a "grown out mullet." L.V.'s father brought law enforcement some still shots of a white truck shown in surveillance video footage of the Beaujolais Apartments across the street

---

[1] Initials are used to protect the privacy of the minor victims.

2

from where the incident with L.V. occurred. The photos, time-stamped close to the time of L.V.'s encounter, showed a white Dodge truck with four doors with black handles. Officer Jason Pharez was assigned the cases, and he visited the apartment complex himself to obtain a copy of the surveillance footage as well, which he found actually captured the incident with L.V. Pharez drove around the area of these two incidents looking for other surveillance cameras, but he found none.[2]

¶4. A few days later, fifteen-year-old M.B. reported that as she was walking home, a white male with brown hair and a beard driving a white pickup stopped and asked her how far he was from her school. When she looked down, she saw his "genitalia" out, and he was fondling himself. M.B. described the male as having dark hair, a "scruffy" appearance, and was in his early thirties. All three girls said the truck was white; L.V. and M.B. told officers it was a four-door truck. M.B. added that it had black door handles.

*The Investigation, Traffic Stop, and Arrest*

¶5. The day after M.B.'s report, at least ten law enforcement officers began a "saturation detail" at the end of the school day in the area where these three incidents occurred. Pharez provided officers with the still shot and description of the white pickup shown in the surveillance video to assist in their search. Specifically, the truck had no lettering or markings on the tailgate, factory aluminum wheels, a chrome front bumper with black top trim, a chrome grill, a front license plate holder, and black door handles. The passenger-side sun visor was down, and something was hanging from the rearview mirror.

---

[2] Law enforcement checked traffic cameras and the sex offender registries, but they were not able to develop any leads from these sources.

3

¶6.     One of the officers on the detail, Austin Barnett, identified a truck that matched the still photo and description. He contacted Pharez, who was nearby, and reported that he believed he found the suspect truck and was initiating a traffic stop. Pharez arrived just as Barnett was pulling Burdine over at a Citgo station. Pharez noted that the sun visor on the passenger side of Burdine's truck was down, there was an air freshener hanging in the rearview mirror, and the grill was chrome with black trim. The vehicle had a front license plate holder and black door handles on the four doors. Pharez also noted that Burdine matched the general description given by the victims.

¶7.     Burdine was alone, and Barnett asked him to exit the truck. When Pharez and Barnett ran a license check, they learned that there were two warrants for Burdine's arrest for failing to appear at court for traffic violations. The officers arrested Burdine pursuant to those arrest warrants. Barnett told Pharez that when he had Burdine exit the vehicle, he noticed that Burdine had a visible erection. Looking through the open truck door, Pharez saw an open jar of "gooey" orange gel in the cup holder, a white t-shirt with orange stains, and Burdine's cell phone lying on the top of the console. After Burdine's arrest, the truck was taken by a wrecker and sealed in preparation for a search warrant.

*The Search Warrants*

¶8.     Pharez obtained a search warrant for the truck, pursuant to which Pharez found an unopened box of condoms and a "black corded vibrator," along with the other items previously observed. From photo line-ups, only M.B. was able to identify Burdine as the man who had exposed himself to her.

4

¶9.    Pharez obtained a second search warrant for Burdine's cell phone, alleging, among other things, that he believed Burdine was accessing child pornography. The affidavit for the search warrant is not included in the record, but it is referenced in Burdine's motion to suppress. In the affidavit, Pharez stated he believed that:

> Christopher Burdine's iPhone may contain geolocation data to corroborate or refute his location on the dates and times of each incident. It may contain photos of children or school bus stops. It may also contain images of child pornography, which is illegal in itself.

On this basis, Pharez obtained a search warrant for the contents of Burdine's phone.

¶10.    Pharez and his supervisor, Lieutenant Kristin Johnson, took the phone to the Mississippi Cyber Initiative in Gulfport, where personnel connected the phone to Graykey software to obtain the passcode. An extraction of the phone's contents was performed using the Cellebrite program. Among items accessed on the phone were videos Burdine had taken of himself exposing himself to each of the girls, A.V., L.V., and M.B. Pharez testified he actually viewed the videos as they were brought up, so he could check for date and times or location data. One of the videos showed Burdine's face and the faces of all three girls as well as Burdine's penis. In another video, Burdine was wearing a blue shirt. A photo of Burdine and his daughter on the home screen and the phone number, which matched the number Burdine provided to law enforcement at booking, confirmed that the cellphone belonged to Burdine.

*The Voyeurism Videos*

¶11.    In addition to the exposure videos in Burdine's phone, Pharez found two separate videos of women in a public bathroom while they were using the bathroom and cleaning

5

themselves. Pharez testified that the phone data and videos reflected that they were recorded on January 2 and January 4, 2023. Officer Pharez went to various gas stations and convenience stores in the St. Martin Community to determine where the videos had been taken. From the bathroom fixtures, a drain, and floor tile shown in the videos, Pharez was able to identify the bathroom at a Circle K gas station in Jackson County, but he could not identify any of the women. Pharez later stated that he thought Burdine had secretly taken the videos because it did not appear that any of the women knew that someone was recording them. Pharez also noted that in the videos, the bathroom had a rectangular white plastic baby changing station, and in one stall, there was a brass floor drain in a very particular spot, a broken toilet paper dispenser with tape on it, and a receptacle for used feminine products. Pharez photographed the Circle K bathroom and compared it to the video for confirmation. The store's surveillance camera had already taped over the dates in question, so neither Burdine nor the women victims could be confirmed as being in the store that day.

*Court Proceedings*

¶12. On July 7, 2023, Burdine was indicted for two counts of filming a person in violation of an expectation of privacy contrary to Mississippi Code Annotated section 97-29-63 (Rev. 2020).[3] The indictment charged Burdine as a habitual offender under Mississippi Code

---

[3] Section 97-29-63, regarding photographing or filming another person in violation of expectation of privacy, provides:

> (1)(a) It is a felony for any person with lewd, licentious or indecent intent to photograph, film, videotape, record or otherwise reproduces the image of another person without the permission of the other person when the other person is located in a place where a person would intend to be in a state of undress and have a reasonable expectation of privacy, including, but not

Annotated section 99-19-81 (Rev. 2020) because he had been convicted of two prior felonies and had been sentenced to terms of imprisonment of one year or more.[4] The indictment

limited to, private dwellings or any facility, public or private, used as a restroom, bathroom, shower room, tanning booth, locker room, fitting room, dressing room or bedroom shall be guilty of a felony.

(b) It is a felony for any person to invade the privacy of another person and with lewd, licentious or indecent intent to photograph, film, videotape, record or otherwise reproduce the image of another, identifiable person under or through the clothing being worn by that other person for the purpose of viewing the body of, or the undergarments worn by, the other person without the consent or knowledge of the other person and under circumstances in which the other person has a reasonable expectation that the other person's body or undergarments would not be viewed or would not be the subject of a reproduced image.

(2)(a) Except as provided in paragraph (b) of this subsection, a person who was over the age of twenty-one (21) at the time of the offense who is convicted of a violation of subsection (1) of this section shall be punished by a fine of Five Thousand Dollars ($5,000.00) or by imprisonment of not more than five (5) years in the custody of the Department of Corrections, or both.

(b) Where the person who is secretly photographed, filmed, videotaped or otherwise reproduced is a child under sixteen (16) years of age, a person who was over the age of twenty-one (21) at the time of the offense who is convicted of a violation of subsection (1) of this section shall be punished by a fine of Five Thousand Dollars ($5,000.00) or by imprisonment of not more than ten (10) years in the custody of the Department of Corrections, or both.

[4] Section 99-19-81, "Sentencing of habitual criminals to maximum term of imprisonment," provides:

Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony unless the court provides an explanation in its sentencing order setting forth the cause for deviating from the maximum sentence, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

recited Burdine's two January 17, 2008 convictions of aggravated assault in the Circuit Court of Harrison County, where, in two different cause numbers (B2402-2006-535 and B2402-2007-635), Burdine was sentenced to ten years' imprisonment. If found guilty in the case at hand, under section 99-19-81, Burdine would receive the maximum sentence. The indictment also included three counts of indecent exposure, one for exposing himself to each victim, in violation of Mississippi Code Annotated section 97-29-31 (Rev. 2020).[5]

¶13. On December 19, 2023, the State moved to amend the indictment to change the habitual offender statute that Burdine was charged under from section 99-19-81 to Mississippi Code Annotated section 99-19-83 (Rev. 2020).[6] This section provides that if

[5] Section 97-29-31, "Indecent exposure," provides:

A person who willfully and lewdly exposes his person, or private parts thereof, in any public place, or in any place where others are present, or procures another to so expose himself, is guilty of a misdemeanor and, on conviction for a first offense, shall be punished by a fine not exceeding Five Hundred Dollars ($500.00) or be imprisoned not exceeding six (6) months, or both. Upon conviction for a second offense within five (5) years, such person shall be guilty of a misdemeanor and shall be punished by a fine of not more than One Thousand Dollars ($1,000.00) or shall be imprisoned not exceeding one (1) year, or both. Upon conviction of a third or subsequent offense within five (5) years, such person shall be guilty of a felony and shall be punished by a fine of not more than Five Thousand Dollars ($5,000.00) or shall be imprisoned for not more than five (5) years in the State Penitentiary, or both. It is not a violation of this statute for a woman to breast-feed.

[6] Section 99-19-83, "Sentencing of habitual offenders to life imprisonment," provides:

Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to and served separate terms of one (1) year or more, whether served concurrently or not, in any state and/or federal penal

8

found guilty as a habitual offender who had committed a crime of violence, Burdine would be sentenced to life in prison. Burdine opposed the State's motion to amend, arguing that the State should be limited to whatever was presented to the grand jury that resulted in the section 99-19-81 indictment.

¶14. In February 2024, Burdine filed several motions, including a motion in limine to prohibit any law enforcement officer from testifying that the gas station videos were taken in "an area where someone would have an expectation of privacy." Burdine alleged that such testimony was speculative and inadmissible. Burdine further filed a motion to "exclude any evidence concerning the venue and location of the alleged bathroom where the alleged videotaping occurred." He added in a separate motion that law enforcement should also be prohibited from testifying that the women in the videos did not consent to the taping. Such testimony, Burdine argued, would be guessing, speculation, and otherwise a denial of Burdine's right to confront the witnesses against him. Using the same arguments, Burdine also filed a motion to dismiss Counts 1 and 2 of the indictment. Burdine also moved to dismiss Counts 1 and 2 for lack of evidence proving that the women in the videos did not consent to the filming. In a separate motion, Burdine sought dismissal of these counts on the basis of venue, arguing that the location of the filming was merely speculation by Pharez. In another motion, Burdine sought to suppress the evidence on the phone based on his claim

---

institution, whether in this state or elsewhere, and where any one (1) of such felonies shall have been a crime of violence, as defined by Section 97-3-2, shall be sentenced to life imprisonment, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole, probation or any other form of early release from actual physical custody within the Department of Corrections.

of an unlawful stop, search, and seizure and that any evidence found pursuant to it was fruit of the poisonous tree. Finally, Burdine moved to sever Counts 1 and 2 from Counts 3, 4, and 5. In March 2024, Burdine filed another motion to suppress, strike, and limit testimony, reciting grounds he had raised in his previous motions.

*Motion to Suppress Hearing*

¶15. The State responded to Burdine's motions in May 2024, and on June 5, 2024, the court held a hearing on Burdine's motion to suppress. Officer Pharez testified to the specifics of the traffic stop, to the search warrants he obtained, and to the videos found on Burdine's phone that supported the indecent exposure counts, as well as the voyeurism counts.[7] Pharez testified to his attempts to find the locations where the voyeurism videos were taken. Pharez pointed out that Burdine appears in at least one of the voyeurism videos. Pharez stated that his investigations revealed that all the indecent exposure incidents and the voyeurism incidents occurred in Jackson County.

¶16. On cross-examination, Pharez admitted that Burdine was not stopped for a traffic violation but, rather, because officers had a reasonable suspicion that this was the vehicle that had been involved in crimes of indecent exposure. The time of day was approximately the same as the times of the incidents, and the area was the same. As an investigator with experience in these types of crimes, Pharez said it was reasonable for him to think that some other type of child sexual abuse material might be on the phone, giving him reason to obtain the search warrant. Pharez confirmed that he was not able to identify the victims of the

---

[7] Pharez said there were approximately 100 other videos of Burdine masturbating at various locations, even one that was being recorded just minutes before the traffic stop.

voyeurism tapes. He also stated that "it was pretty plain" from watching the videos that there was no consent given and that this was not any type of consensual encounter. There was no conversation with them in which they gave Burdine permission to tape them.

¶17. Because Burdine had not subpoenaed Officer Barnett, the court continued the hearing on the motion to suppress. But the court heard arguments on the other motions filed. The court granted the State's motion to amend the indictment and denied all of Burdine's other motions. On June 17, 2024, the court reconvened the hearing on the motion to suppress and heard testimony from Officer Barnett. Barnett testified to identifying the pickup truck, and, as he drove past the truck, he determined that the truck's driver matched the description given by the girls. He followed the truck and then activated his blue lights to conduct the traffic stop. Pharez arrived as Burdine was pulling over. Barnett said he could see Burdine moving around in the car. After Burdine exited the vehicle, because Burdine kept reaching back in, Barnett frisked him for weapons. He noticed that Burdine had an erection. Officer Pharez then took over the stop. There being no further testimony, after argument of counsel, the court denied Burdine's motion to suppress.

*Trial*

¶18. Trial on the charges began on November 12, 2024. In opening statements, Burdine's counsel conceded to the recorded proof of Burdine's misdemeanor exposure charges. But, he argued, the State would fail to prove that there was no consent to the filming in the bathroom or that the bathrooms were in Jackson County.

¶19. The three girls each testified. In addition to the previous facts already stated, A.V.

11

pointed out on a map where she had been dropped off by the bus and where she was approached by the man in the white truck. L.V. testified that she was walking to the store when the truck drove up and the driver masturbated in front of her. She did not tell her parents that day because she did not want to ruin her mother's birthday that was the next day. When she did tell them about it a week later, her mother was helpful. L.V. said she was nervous and the incident scared her because she felt the man was wanting to do something to her, like get her into his truck. She said the man had brown hair and that "he just looked shaggy." But on cross-examination, L.V. said that she initially could not identify the person in the truck, nor could she recall details about the truck.

¶20.    M.B. testified that she was seventeen now and that she had been diagnosed with autism spectrum disorder. She said that the day she encountered Burdine was the second day in a row that she had seen the white truck come down her road. When Burdine asked her for directions to her school, she looked down and saw his genitalia out, and she just walked away and called the police. She told them it was a white Dodge with what she recalled were two doors and a little high off the ground. She, too, identified on a map where she lived and where the incident happened. M.B. also identified the photographic line-up she had been presented, where she identified Burdine.

¶21.    None of the three girls knew that Burdine had recorded the incidents, and the State entered into evidence still shots of each of them taken from Burdine's recordings.

¶22.    Officer Pharez then testified that he had worked in law enforcement for eighteen years and had been a criminal investigator of crimes against minors prior to his current assignment

12

as a firearms instructor. Pharez testified about the reports that the girls had made. He further explained how L.V.'s father had provided still photographs of the vehicle from the surveillance camera at the Beaujolais Apartments, just across the street from where the incident took place. Pharez told the jury how he personally went to the apartment complex and obtained the surveillance video showing the truck. The footage was entered into evidence, and Pharez pointed out several details of the truck for the jury. Because the video showed L.V. walking down the street and the white truck stopping (the actual incident), Pharez felt confident that they had identified the vehicle. Pharez continued to testify about how Burdine was stopped and arrested, as well as the ensuing search warrants and video recordings found. The items found in the truck, including the cell phone, were entered into evidence.

¶23. Pharez testified that they asked Burdine for the passcode to his phone, but Burdine indicated that he wanted to consult with counsel. Knowing that phones contained data that can be useful in investigations, e.g., GPS data, web searches, et cetera, Pharez sought a search warrant to obtain access to the contents of Burdine's phone. With the search warrant in hand, Pharez and his supervisor, Lt. Johnson, took the phone to the Mississippi Cyber Initiative in Gulfport, which was like a classroom computer lab. It is free for law enforcement to use, and the center provides trained individuals who can help if an officer does not know how to access or use the software. Pharez said that he and Johnson had staff connect the phone to the Graykey software, and with that, he found the password and was able to conduct a "Cellebrite extraction" of the phone's contents. This involved taking the

13

raw data from the phone and then using the Cellebrite program to download the phone's contents to a computer. Johnson was qualified to use Cellebrite at the time. Burdine objected to Pharez testifying to what some other, although qualified, individual did. The objection was overruled. Pharez continued that he then examined all the data in the phone. A thumb drive with the data of all the contents of Burdine's phone was entered into evidence over Burdine's objection.

¶24.    Pharez said he personally reviewed the phone extraction as he has done numerous times over the years. Pharez then testified that the dates of the recording of the incidents matched the dates the girls reported their interactions with Burdine occurred. The recordings of each were entered into evidence and shown to the jury.

¶25.    Pharez then testified about the videos of women using a public bathroom. He explained to the jury how he visited numerous gas stations and convenience stores and identified the particular Circle K where he believed the recording was done. Pharez said he did not know the identities of the women in the videos. He tried to find out by asking management of the Circle K where he determined the videos were taken. He asked for the store's security camera footage, but he was told that the video did not go back that far. Pharez noted that in the bathroom videos from Burdine's phone, the individual filming was wearing a blue shirt and a ball cap with a "B" on it, similar to the blue shirt and cap Burdine wore when he filmed the indecent exposure videos. The State also entered a photograph of the home screen of Burdine's phone with the videos that shows Burdine with his nine-year-old daughter.

¶26. On cross-examination, Pharez admitted there was no one who would testify about the identity of the women in the bathrooms or if they gave their permission to the taping. Pharez also stated that he had not received formal training in the Graykey software and that he is not certified to use Cellebrite software. He admitted that the person who was trained and utilized the software was not present to testify. However, Pharez said he observed everything that was going on. Pharez explained:

> Q. Okay. So you're the one that's trying to proffer this evidence before this jury that -- saying that it is true, accurate and fair; correct?
>
> A. Yes. And that comes from several years of looking at the Cellebrite reports. They are put into a reader that is available to -- here at the sheriff's office to any investigator. You open the reader, which is like a browser for the program, and then you click on a little yellow file folder, just like you would in File Explorer once the reader opens, and it contains, you know -- it has, like, a file name for whatever phone file you want, and you just double click that. It dumps everything into the Cellebrite reader and it calls[,] we call it parsing, but it basically organizes it into folders, web bookmarks, Internet history, photos and videos; basic phone information. And you click on the tab, and it pops up with everything that's on the phone.
>
> Q. But you didn't do that, someone else did that; true?
>
> A. Yes. Lieutenant Johnson was the one who converted it into Cellebrite, which she was certified or qualified, whatever you want to say, to use, at the time at my direction, and as soon as that was put into Cellebrite reader, it was made available to me. I had access to her server where these things are stored because we both work cyber crimes.

The recordings of the women in the bathroom show they were created on January 2, 2023, and January 4, 2023. Burdine's counsel pressed Pharez about whether his testimony that the bathroom recordings were made at the Circle K convenience store was merely an opinion or guess. Pharez pushed back, stating that the photos of the Circle K bathroom that he took

15

showed so many similarities to the bathroom in the videos, that his conclusion was not a guess.

¶27. On redirect, Pharez clarified that he personally viewed the videos entered into evidence when he looked into Burdine's phone himself. Pharez stated:

> Q. Just to be crystal clear, have you ever powered up this phone and looked in it?
>
> A. Have I physically powered [--]
>
> Q. Yeah.
>
> A. -- it up and looked in it? Yes. I had to at one point because some of the videos from the extraction would not play for me, for me to review, so I had to physically retrieve the phone itself out of evidence, logging out -- I'm sure the chain of custody is written on there with the dates and all that good stuff. I had to power it up and go back into the phone manually myself to be able to view some of the videos that would not play for me on that Cellebrite reader.
>
> Q. And those are the videos that you've testified about today?
>
> A. Yes.
>
> Q. And those videos on 25, Exhibit 25, are the same things that are on 25A, which is the Cellebrite extraction?
>
> A. The extraction is a carbon copy of the contents of the phone.
>
> Q. And so all of the evidence that was in the defendant's phone is available for this jury?
>
> A. Right there.

Basically, Pharez testified that when he could not view some videos through Cellebrite, he went back, the old-fashioned way, and simply looked on the phone and found the recordings as one could with any other phone.

16

¶28. After Pharez testified, the State rested. Burdine moved for a directed verdict on Counts 1 and 2 (the voyeurism charges) on the basis of lack of proof of no consent, and further, because the evidence was not presented through expert testimony and was procured through a baseless search warrant. After hearing arguments, the court denied the motion, ruling that the issues raised were questions for the jury.

¶29. Burdine told the court he did not want to testify. When the jury returned, the defense rested. The court instructed the jury, who then heard closing arguments and deliberated. Although not noted in the transcript, during deliberations, the jury sent out two questions: "Define extraction in regards to this case?" and "If photos are extracted, would they still be available on the phone?" The court responded, "The court cannot answer these questions. You have all the evidence you are to consider." The jury then returned a guilty verdict on all five counts.

*Sentencing Hearing*

¶30. The court held a sentencing hearing on December 4, 2024. The State entered into evidence Burdine's January 2008 indictments, convictions, and sentences for two separate offenses of aggravated assault with a bat from the Second Judicial District of Harrison County. According to the State, these documents showed that Burdine received a ten-year sentence on each count and that he served 475 days (more than one year) in the custody of the Mississippi Department of Corrections, meeting the statutory requirements of section 99-19-83. Burdine presented no evidence, but argued that a life sentence under the habitual enhancement statute would be unconstitutionally disproportionate. After hearing argument,

17

the court sentenced Burdine to life imprisonment without eligibility for parole on each conviction of Counts 1 and 2 (voyeurism) and to serve six months in custody for each conviction of Counts 3 through 5 (indecent exposure), along with fines, court costs, and contribution to the victims' compensation fund.

¶31. On December 16, 2024, Burdine filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, raising several issues, including, but not limited to, alleged errors by the court in not suppressing evidence, in allowing law enforcement to testify to the content of the phone, and in sentencing him. After hearing arguments, the court denied the motion on January 13, 2025. On January 23, 2025, Burdine filed his notice of appeal.

¶32. Burdine raises five issues on appeal: (1) whether the alleged content of Burdine's cell phone was erroneously admitted into evidence, (2) whether there was sufficient evidence to establish venue in Counts 1 and 2, (3) whether incompetent lay opinions were erroneously entered into evidence, (4) whether the State proved all the requirements for habitual sentencing under section 99-19-83, and (5) whether the two life sentences for Counts 1 and 2 are unconstitutionally disproportionate.

**Discussion**

**I.     Whether the alleged content of Burdine's cell phone was erroneously admitted into evidence.**

¶33. Burdine makes three arguments why the cell phone should have been suppressed: that the phone was found during an illegal traffic stop, that the search warrant issued for the contents of the phone was not based on probable cause, and that the material retrieved from

18

the phone was not validly authenticated.

### A.  Legality of the Stop

¶34.  "On appeal, we must determine the lawfulness of the investigatory stop, as any evidence derived from an illegal search or seizure will be deemed tainted as 'fruit of the poisonous tree.'" *Wilson v. State*, 358 So. 3d 1069, 1072 (¶13) (Miss. Ct. App. 2022).  "An officer may make a brief, investigatory stop of a vehicle if the officer has reasonable suspicion to believe that the occupants of the vehicle have been, are currently, or are about to be involved in criminal activity." *Govero v. State*, 302 So. 3d 702, 705 (¶8) (Miss. Ct. App. 2020) (quoting *Martin v. State*, 240 So. 3d 1047, 1050 (¶9) (Miss. 2017)).  "The suspicion must be 'grounded in specific and articulable facts.'" *Id*. (quoting *Eaddy v. State*, 63 So. 3d 1209, 1213 (¶14) (Miss. 2011)).

¶35.  "Reasonable suspicion is dependent upon the content of the information possessed by the detaining officer as well as its degree of reliability." *Williamson v. State*, 876 So. 2d 353, 355 (¶11) (Miss. 2004).  An officer's suspicion can be based on his personal observation or on information from a reliable source, the quantity and the quality of which are considered given the totality of the circumstances. *Id*.  In other words, taking into account the totality of the circumstances, this Court must consider whether the officer had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Dies v. State*, 926 So. 2d 910, 918 (¶21) (Miss. 2006).  The question of reasonable suspicion is determined on a case-by-case basis. *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 115 (¶18) (Miss. 1999).

19

¶36. "Whether probable cause or reasonable suspicion exists is subject to a de novo review. But the Court limits the de novo review of the trial court's determination to 'historical facts reviewed under the substantial evidence and clearly erroneous standards.'" *Wright v. State*, 334 So. 3d 1115, 1117 (¶5) (Miss. 2021) (quoting *Martin*, 240 So. 3d at 1050 (¶7)).

¶37. In the case at hand, the State agrees that Burdine was not stopped for any traffic violation observed by Officer Barnett.[8] However, Barnett, like all officers involved in the saturation detail, had been briefed on the reports of the girls who were the victims of Burdine's indecent exposure. One had described the predator as having a scruffy beard and being in his twenties or thirties. Barnett and other officers were aware of the location of these incidents in an area of the St. Martin's community near the school. Officers also knew dates and times of these incidents, all occurring in early January after school between 3 and 4:30 p.m. Officer Pharez had obtained surveillance video from the Beaujolais Apartments that actually recorded one of the incidents and showed a white Dodge pickup truck stopping by one of the victims. Pharez made still shots of the vehicle that he passed out to the officers. The vehicle was described as having certain characteristics with something dangling from the rearview mirror and a chrome grill with black trim.

¶38. Armed with this information, Barnett patrolled the area in question during the times the perpetrator might be trying to encounter other young girls. He passed an oncoming vehicle that closely resembled the truck in the photos that was driven by a white male

---

[8] "As a general rule, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Turner v. State*, 412 So. 3d 1200, 1207 (¶26) (Miss. Ct. App. 2025); *Trejo v. State*, 76 So. 3d 702, 706 (¶9) (Miss. Ct. App. 2010), *aff'd*, 76 So. 3d 684 (Miss. 2011).

generally matching the description given by the girls. Based on this information, Barnett felt he had reasonable suspicion to initiate an investigatory stop, and the trial court agreed. We have held that an officer had reasonable suspicion in *Wrenn v. State*, 281 So. 3d 838, 842 (¶16) (Miss. Ct. App. 2018). There, dispatch notified officers that a man had fired a gun and driven away "from Heather Cove in a large, loud, white truck, possibly a Ford 150 or a Chevy." *Id*. at 840 (¶2). Officer Magill was nearby, and as he approached the area, two people were pointing and directing him to go north. *Id*. at (¶5). Magill proceeded north and spotted the truck that he believed fit the dispatcher's description and initiated a stop. *Id*. On appeal, we held that Magill "had reasonable suspicion, grounded in specific and articulable facts, to believe that Wrenn was the suspect fleeing the recent shooting a short distance away on Heather Cove." *Id*. at 842 (¶16).

¶39.   Burdine argues that *Wrenn* is distinguishable because in the case at hand, there was no "close-in-time" report of a vehicle leaving the scene of a crime. However, Barnett was patrolling the area where the previous crimes had occurred just days before, at a time of day that those crimes happened, and he had a photograph of the vehicle taken at the time of one of the incidents. The totality of the circumstances here supports the court's finding of reasonable suspicion.

¶40.   Likewise, the case at hand differed from *Cook v. State*, 159 So. 3d 534, 541 (¶18) (Miss. 2015), where the Mississippi Supreme Court held that an uncorroborated anonymous tip was insufficient to conduct an investigatory stop. In that case, Officer Ware received a "BOLO" ("be on the lookout") for a gray Chevrolet Avalanche driving erratically, and the

21

driver flashing some sort of badge. *Id*. at 536 (¶3). Ware saw a vehicle matching that description and followed it. *Id*. He noticed no erratic driving or the driver flashing any badge but, nonetheless, initiated a stop. *Id*. Ware arrested the driver, Cook, for DUI. *Id*. Although Cook contested the stop, he was convicted, and the conviction was affirmed by this Court. *Id*. at (¶4). On a petition for writ of certiorari, the Supreme Court reversed, noting:

> Reasonable suspicion generally stems from one of two sources: an officer's personal observation, or an informant's tip. An informant's tip may provide reasonable suspicion if accompanied by some indication of reliability; for example, reliability may be shown from the officer's independent investigation of the informant's information.

*Id*. at 537 (¶7) (citation omitted). The Court reviewed other cases where officers had received anonymous tips but had no information to verify them, including *Eaddy*, 63 So. 3d at 1214 (¶18) (finding that an unverified anonymous tip that an individual with three arrest warrants was driving a red Cadillac was insufficient to support a stop). In the case at hand, however, Officer Barnett was acting on reports of crimes filed by the victims, not an anonymous tip. He had three different sources that described the vehicle and at least one that described the perpetrator. Thus, we find that Barnett had reasonable suspicion to initiate the investigative stop in this case and that the items retrieved during that stop and subsequent search pursuant to a search warrant of the vehicle were lawfully seized, including Burdine's cell phone.

### B.     *Search Warrant of the Phone Contents*

¶41.    In *Ehrhardt v. State*, 376 So. 3d 372, 376 (¶6) (Miss. Ct. App. 2023), we reiterated our standard of review of probable cause rulings on the issuance of a search warrant, stating:

22

> In reviewing a magistrate's finding of probable cause, this Court does not make a de novo determination of probable cause, but only determines if there was a substantial basis for the magistrate's determination of probable cause. *Roach v. State*, 7 So. 3d 911, 917 (¶12) (Miss. 2009) (quoting *Petti v. State*, 666 So. 2d 754, 758 (Miss. 1995)). Our review is guided by the totality-of-the-circumstances analysis established by the United States Supreme Court. *Lee v. State*, 435 So. 2d 674, 676 (Miss. 1983) (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)).

We further noted:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Ehrhardt*, 376 So. 3d at 376 (¶6).

¶42. In the case at hand, Pharez's affidavit used to secure the search warrant for the phone is not included in the record. The only information we have of it is referenced in Burdine's motion to suppress. Even with that motion, the affidavit was not attached as an exhibit. Nor were the actual findings of the issuing judge or the search warrant itself included. Thus, as in *Ward v. State*, 958 So. 2d 1233, 1236 (¶9) (Miss. Ct. App. 2006), we are unable to review Pharez's affidavit for adequacy to support the search warrant for the phone. In *Ward*, we noted the obligation of the appellant to furnish a record that is adequate for our review. *Id*. Here, Burdine did not, and he is therefore procedurally barred from raising this issue on appeal. Moreover, without the affidavit, anything reflecting the findings of the issuing judge, or the search warrant itself, we cannot discern the totality of the circumstances to be able to determine if the judge made a practical, common-sense decision for issuing it given all the

circumstances before him.[9]  Thus, we do not address this issue notwithstanding the procedural bar.

### C.     Authentication of Phone Contents

¶43.    Burdine's third basis for the suppression of the recordings found on his cell phone is that they were not lawfully authenticated prior to their admission.  He argues that the recordings entered into evidence were retrieved from his phone using the Cellebrite extraction program, but the person who did the extraction, Lt. Johnson, was not called to authenticate the data retrieved.  Instead, Pharez testified that he viewed the recordings both on the Cellebrite extraction and on the phone directly and testified that they were what Pharez purported them to be, recordings of Burdine exposing himself to each of the three girls as well as two recordings of women using a public restroom.

¶44.    Rule 901 of the Mississippi Rules of Evidence requires that any evidence be authenticated before it can be admitted into evidence.  As stated in Rule 901(a),

> (a) In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

MRE 901(a) goes on to provide examples of authenticating evidence, including the testimony of a witness with knowledge that the item is what it is claimed to be.  MRE 901(b)(1).

¶45.    Burdine concedes that the United States Court of Appeals for the Fifth Circuit has

---

[9]  In *Ward*, we proceeded to determine that the affidavit was sufficient for the issuance of a search warrant because the State's reply brief quoted portions that included verification of the suspicions of the officers by other agencies. *Ward*, 958 So. 2d at 1236 (¶10).  We also had the search warrant that was issued that included the findings of the issuing judge. *Id*. at 1237 (¶12).  In this case, we have nothing but a single reference in a motion that relates to the affidavit underlying the search warrant for the phone.

recently held, in a case of first impression, that expert testimony is not needed to authenticate information retrieved from a phone using Cellebrite. *United States v. Williams*, 83 F.4th 994, 995 (5th Cir. 2023). In that sex trafficking case, police used Cellebrite to copy information from Williams's phone. *Id*. at 994. The court explained that an investigator merely plugged the phone into a Cellebrite device and ran the program. *Id*. "The program pulled out the user data . . . and provided it to the police in an accessible, easily-navigable, and readable format." *Id*. at 995. At trial, the investigator who used Cellebrite to authenticate information pulled from the phone testified that he had no knowledge of Cellebrite's technology or if any malware may have affected the data extraction. *Id*. at 996. Williams objected and argued it was reversible error for the court to admit the Cellebrite data without an expert because "Cellebrite is a complex technology, *ergo*, the operation of Cellebrite requires specialized knowledge." *Id.* But the Fifth Circuit disagreed, stating:

> But this ignores the basic realities of life. All the officer did was run a computer program. He offered no technical understanding of the machine or software; he did not write the program; and he did not opine on any application of specialized knowledge. . . . This is the antithesis of Rule 702's requirement of "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). Rather, the investigator knew no more than anyone else who runs a program on his computer that he did not write.

*Id*. at 996-97. The Court noted that the investigator did not testify about the reliability of the Cellebrite program, except that he double-checked some of the report by looking directly at the source material in the phone itself. *Id*. at 997. The Court held that "when law enforcement uses Cellebrite to pull information from a phone and a lay juror would require no additional interpretation to understand that information, the party does not need to

introduce the evidence through an expert." *Id*. at 995.

¶46.	Despite *United States v. Williams*, Burdine argues that under Mississippi law, Pharez could not authenticate the recordings from Burdine's phone. He cites *Conway v. State*, 915 So. 2d 521, 526 (¶19) (Miss. Ct. App. 2005), where we held that an edited tape of a crime scene could not be authenticated by a detective who was never at the crime scene, who admitted he never viewed the full version of the crime scene tape, or generated the edited tape. But *Conway* is inapplicable in the case at hand because Pharez could and did vouch for the authenticity of the recordings. He testified that although he viewed the recordings on the Cellebrite extraction, he also went directly to Burdine's phone and viewed them as well.

¶47.	Similarly, in *Wilson v. State*, 267 So. 3d 264, 270 (¶¶25-26) (Miss. 2019), when the defendant challenged the admission of an edited version of his interview by law enforcement officers, we held that the authentication testimony of the officer who actually conducted the interview and was familiar with its contents was sufficient for admission of an edited version. He could testify that the edited version was what it claimed to be. *Id*. at (¶27).

¶48.	"A party need only make a prima facie showing of authenticity, not a full argument on admissibility." *Id*. at (¶24) (internal quotation marks omitted) (citing *Walters v. State*, 206 So. 3d 524, 535 (¶32) (Miss. 2016)). Here, Pharez testified that he personally had viewed the videos that were entered on both Burdine's phone and the Cellebrite extraction data. Therefore, he could testify that they were what they were purported to be, given both the Mississippi and Fifth Circuit cases cited above, satisfying the requirements of Rule 901 and properly authenticating the videos for admission into evidence.

26

## II. Whether there was sufficient evidence to establish venue in Counts 1 and 2.

¶49. Burdine contends that the State failed to prove proper venue for Counts 1 and 2, namely, that Burdine filmed the women in a bathroom in Jackson County.

¶50. "'Proof of venue is an essential part of criminal prosecution' that the State must prove beyond a reasonable doubt." *Allen v. State*, 411 So. 3d 146, 154-55 (¶33) (Miss. 2025) (quoting *Hill v. State*, 797 So. 2d 914, 916 (¶9) (Miss. 2001)). Venue may be proved by either direct or circumstantial evidence." *Id*. (citing *Jones v. State*, 606 So. 2d 1051, 1055 (Miss. 1992)). On appeal, this Court reviews the sufficiency of evidence by determining whether rational, fair-minded jurors could have found that the State proved each essential element of the crime charged in the light most favorable to the prosecution. *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010). In *Allen*, the Supreme Court stated, "As long as the evidence is sufficient to lead a reasonable trier of fact to conclude that the crime in the present case occurred at least partly in [Yazoo] County, then the evidence of venue is sufficient." *Allen*, 411 So. 3d at 154 (¶33). When reviewing the sufficiency of venue evidence, the State gets "the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Id.*

¶51. Pharez testified that the films related to Counts 1 and 2 were taken in a gas station at a Circle K in Jackson County. Burdine argues that there was nothing unique about the Jackson County Circle K convenience store bathroom in Jackson County that Pharez identified that would distinguish it from any other Circle K in any other county. Burdine claimed Pharez merely conveyed his opinion that was no more than a speculative guess.

27

However, Pharez testified at length about his search for the location of the filming. He viewed the recordings and noted the tile color, tile pattern, and baby changing station that helped him distinguish the bathroom as a Circle K bathroom from other gas stations and convenience stores in the area. Pharez further identified distinctive features in the bathroom, such as a taped toilet tissue dispenser and a brass-colored drain fixture in a particular location between the stalls. Pharez took photographs of the Circle K gas station he identified and compared them to the videos to confirm the location. It was only logical that Pharez looked for gas station bathrooms in Jackson County because Burdine said he worked in the Vancleave area in Jackson County, and the indecent exposure incidents occurred in Jackson County.

¶52. Giving the State the benefit of all reasonable inferences and the circumstantial evidence collected by Pharez, we hold that rational, fair-minded jurors could have found that the State proved that Burdine filmed the videos relevant to Counts 1 and 2 in Jackson County, thereby proving an essential element of the crimes charged, namely venue.

### III. Whether incompetent lay opinions were erroneously entered into evidence.

¶53. Burdine objects to what he contends were several lay witness opinions given by Officer Pharez that Burdine feels prejudiced the jury against him. These included Pharez's testimony concerning the dates the secret filmings were made, the fact that the filmings were secret and made without the women's consent, and that the bathroom recordings were made in Jackson County.

#### A. Video Dates

28

¶54.    Burdine argues that Pharez, who was not designated as an expert, gave what was in effect an expert opinion when he reviewed the Cellebrite data and testified to the dates of the bathroom recordings as reflected in the data as January 2 and January 4, 2023.  The State responds that Pharez was not offering an opinion, but simply testifying to his personal observation of these recordings, which were dated, directly on Burdine's phone, and admitted into evidence.

¶55.    Concerning these dates, Pharez testified at trial that he had reviewed the Cellebrite data download to obtain the dates the bathroom recordings were made.  Referring to the report of the Cellebrite data, Pharez was questioned:

> Q.    Do those fairly and accurately depict -- or they fairly and accurately set forth the dates and times you observed on the phone for those particular videos?
>
> A.    Yes.

However, later in his testimony, Pharez said that he had to manually check the recordings directly on Burdine's phone.  Either way, from the *United States v. Williams* case we have previously cited and apply for purposes of this case, a police officer can testify about information a phone obtained in a Cellebrite data extraction.  *Williams* held that "when law enforcement uses Cellebrite to pull information from a phone and a lay juror would require no additional interpretation to understand that information, the party does not need to introduce the evidence through an expert."  *Williams*, 83 F.4th at 995.  Accordingly, the record reflects that the dates of the secret recordings were not lay witness opinions but, rather, facts proved by the recordings themselves found on Burdine's cellphone.

## B. Videos Secretly Recorded Without Consent

¶56. Burdine quotes Pharez's testimony when he was asked to describe the videos he found on Burdine's phone, in addition to the videos of the indecent exposure incidents. Pharez replied:

> So of particular note there were numerous videos of him going into what appeared to be gas station women's bathrooms and -- that had multiple stalls, and he appeared to be surreptitiously videoing various women while they would be using the bathroom and cleaning themselves. And it didn't appear that any of these women knew that he was present.

Burdine objected, and on appeal, he contends that this lay witness opinion was an opinion on the ultimate issue for the jury to decide (that the filming was secret and without consent), and so prejudiced him that his conviction should be overturned.

¶57. The State responds that Mississippi Rule of Evidence 704 specifically provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." The Comment to the Rule notes that opinion testimony is no longer objectionable solely on grounds that it "invades the province of the jury." MRE 704 cmt.

¶58. "Evidence admissibility is reviewed under an abuse of discretion standard." *Hall v. State*, 424 So. 3d 415, 418 (¶11) (Miss. Ct. App. 2025). "The admissibility of evidence is largely within the discretion of the trial court and reversal may be found only where that discretion has been abused." *Shirley v. State*, 942 So. 2d 322, 329 (¶26) (Miss. Ct. App. 2006) (citing *Weaver v. State*, 713 So. 2d 860, 865 (¶31) (Miss. 1997)).

¶59. Under Rule 701 of the Mississippi Rules of Evidence,[10] a lay witness's opinion is

---

[10] Mississippi Rule of Evidence 701, "Opinion Testimony by Lay Witnesses," provides:

admissible only if it is "rationally based on the witness's perception and is helpful to a clear understanding of his testimony or of a fact in issue." *Shirley*, 942 So. 2d at 328 (¶23). "A lay witness may testify regarding an opinion that is rationally based upon his personal perceptions, and that will help the jury fairly resolve a controverted, material fact." *Harris v. State*, 311 So. 3d 638, 657 (¶49) (Miss. Ct. App. 2020).

> Under 704 of the Mississippi Rules of Evidence, opinion testimony is not objectionable merely because it embraces an ultimate issue to be decided by a trier of fact. The comment to Rule 704 provides that such questions which relate to ultimate issues of fact are allowed if they are "helpful to a determination of the case."

*Shirley*, 942 So. 2d at 329 (¶26). However, "[q]uestions which would merely allow a witness to tell the jury what result to reach are not permitted." *Id*.

¶60. In the case at hand, Pharez testified about the video recordings he found on Burdine's phone. Pharez's recounting to the jury that the videos associated with Counts 1 and 2 were filmed in a public bathroom at a gas station was the factual result of his investigation and was helpful to the jury. Pharez's testimony that "it appeared" that the filming was done surreptitiously and without the women's knowledge was his opinion, but not inadmissible under Rule 704 simply because it was an opinion on the ultimate issues. It certainly met the criteria of an admissible lay opinion under Rule 701—it was based on his own perception

---

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
    (a) rationally based on the witness's perception;
    (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
    (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

having personally visited the Circle K bathroom, it was not based on technical or scientific knowledge, and jurors could find it helpful in understanding the flow of what was happening in the videos. Accordingly, we find no abuse of discretion in the admission of Pharez's testimony concerning the bathroom videos.

C. Venue

¶61. Burdine claims that Pharez's testimony that the secret bathroom videos were filmed at a particular Circle K constituted inadmissible lay witness opinion. However, in *Kelly v. State*, 778 So. 2d 149, 152 (¶17) (Miss. Ct. App. 2000), where there was a dispute over the county's boundary and in which county the crime was committed, we affirmed a circuit court's ruling on venue based on a law enforcement officer's testimony that as a result of his investigation he could say that the crime occurred within Clay County. In the case at hand, Pharez's thorough investigation of gas station and convenience store bathrooms and his diligence in taking photographs and comparing them to the videos demonstrated a reliable basis for his opinion and for the court and the jury to conclude that venue for those crimes was Jackson County. We find no abuse of the circuit court's discretion in allowing Pharez's testimony concerning venue.

**IV. Whether the State proved all the requirements for habitual sentencing under Section 99-19-83.**

¶62. Under Counts 1 and 2, the State charged Burdine as a habitual offender under Mississippi Code Annotated section 99-19-83.[11] After being found guilty, the circuit court

---

[11] In the original indictment Burdine was charged as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81, which would have made him subject to the maximum penalty for the charges of filming without permission. The State later amended

sentenced him to life imprisonment for both convictions. On appeal, Burdine argues that the State failed to prove his status as a violent habitual offender beyond a reasonable doubt.

### A. Procedural Bar

¶63. We first note that Burdine failed to object to the proof presented at the sentencing hearing, which consisted of certified records of his two separate aggravated assault convictions and sentences. Burdine's counsel agreed that Burdine had been convicted twice before and made no objection when the court added that Burdine had served at least a year. Burdine did not object to the court's finding that he was "a life habitual." A defendant's failure to object that the State had not proved habitual offender status to the sentencing court waives that issue on appeal. *Conner v. State*, 138 So. 3d 143, 150 (¶19) (Miss. 2014); *see also Logan v. State*, 192 So. 3d 1012, 1020 (¶23) (Miss. Ct. App. 2015) (quoting *Sims v. State*, 775 So. 2d 1291, 1294 (¶16) (Miss. Ct. App. 2000)) ("The supreme court and this court have previously made clear that: 'When an accused fails to object to the habitual[-]offender issue during the sentencing phase, he is procedurally barred to do so the first time on appeal.'"). Here, because Burdine failed to raise his objection to the State's proof at the sentencing hearing, he is procedurally barred from arguing that issue on appeal.

### B. Sufficiency of Evidence Presented

¶64. Notwithstanding the procedural bar, we find that the proof presented by the State sufficiently proved Burdine's violent habitual offender status.

---

the indictment to charge Burdine under section 99-19-83 with prior crimes of violence, which mandated life sentences if found guilty. Burdine does not appeal the propriety of the amendment of the indictment.

¶65. Section 99-19-83 provides:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to and served separate terms of one (1) year or more, whether served concurrently or not, in any state and/or federal penal institution, whether in this state or elsewhere, and where any one (1) of such felonies shall have been a crime of violence, as defined by Section 97-3-2, shall be sentenced to life imprisonment, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole, probation or any other form of early release from actual physical custody within the Department of Corrections.

Miss. Code Ann. § 99-19-83. The documents presented by the State established that Burdine was charged with two separate aggravated assault charges, one occurring in 2006 and the other in 2007. Both were crimes of violence under Mississippi Code Annotated section 97-3-2 (Rev. 2014).[12] Burdine pled guilty to both charges on January 7, 2008, and received ten-year sentences on each, set to run concurrently. As Burdine calculates, by that time, he had spent 233 days in custody, pre-conviction. Burdine was discharged from custody to post-release supervision on November 29, 2008, approximately 317 days after his plea and sentencing. Thus he spent 550 days in custody for these convictions.

¶66. To establish a defendant's habitual offender status, "the State must prove that a defendant has not only been at least twice previously convicted but that he has been sentenced to and has served separate terms of one (1) year or more in any state and/or federal

---

[12] Section 97-3-2(1)(c) provides:

(1) The following shall be classified as crimes of violence:

. . . .

    (c) Aggravated assault as provided in Sections 97-3-7(2)(a) and (b) and 97-3-7(4)(a)[.]

34

penal institution." *Bogard v. State*, 624 So. 2d 1313, 1320 (Miss. 1993). "A defendant's preconviction jail time is included in the calculation of his time served toward a sentence for the purposes of Section 99-19-83." *Rice v. State*, 134 So. 3d 292, 296 (¶11) (Miss. 2014) (citing *Feazell v. State*, 761 So. 2d 140, 142 (¶11) (Miss. 2000)). Moreover, the Mississippi Supreme Court has held that

> serving one year or more on concurrent sentences for separate convictions arising out of separate incidents amounts to serving more than one year on each sentence for the purpose of enhanced sentencing under § 99-19-83 which applies to defendants "who shall have been sentenced to and served separate terms of one (1) year or more[.]"

*Bogard*, 624 So. 2d at 1320-21; *see also King v. State*, 527 So. 2d 641, 645 (Miss. 1988) ("The question, thus, is whether serving one year or more on concurrent sentences for separate convictions amounts to serving more than one year on each sentence. We hold that it does.").

¶67.    Here, Burdine's sentences for each of the aggravated assault charges ran concurrently, and the record reflects that he served over a year of those sentences in custody. Therefore, the State presented sufficient proof to establish Burdine's habitual offender status.

> V.    **Whether the life sentences in Counts 1 and 2 are unconstitutionally disproportionate.**

¶68.    Because of his violent habitual offender status, under section 99-19-83, Burdine was sentenced to life imprisonment for his convictions of both Count 1 and Count 2. Burdine argues that the two life sentences for his convictions of voyeurism, a crime that carries a maximum penalty of five years' incarceration, are unconstitutionally disproportionate.

¶69.    "Sentencing is within the complete discretion of the trial court and not subject to

appellate review if it is within the limits prescribed by statute." *Rodriguez v. State*, 413 So.

3d 646, 658 (¶40) (Miss. Ct. App. 2025). Here, Burdine was sentenced under section 99-19-

83, which mandates life imprisonment for violent habitual offenders: "Every person

convicted in this state of a felony who shall have been convicted twice previously . . . who

shall have been sentenced to and served separate terms of one (1) year or more, . . . and

where any one (1) of such felonies shall have been a crime of violence . . . **shall** be sentenced

to life imprisonment . . . ." (Emphasis added). "Where a sentence is within the prescribed

statutory limits, it will generally be upheld and not regarded as cruel and unusual." *Skinner*

*v. State*, 354 So. 3d 327, 339 (¶25) (Miss. Ct. App. 2022) (citing *Tate v. State*, 912 So. 2d

919, 933 (¶48) (Miss. 2005)). Here, Burdine received a sentence within the limits prescribed

by the habitual offender statute.

¶70.    However, as the Mississippi Supreme Court stated in *Russell v. State*, 346 So. 3d 435,

438 (¶15) (Miss. 2022), the "discussion does not end there," and the prescribed sentence

must meet federal constitutional proportionality requirements. In that case, Russell was tried

and convicted of possession of marijuana, which carried a maximum sentence of three

years.[13] However, because he had three prior felony convictions for crimes of violence: two

---

[13] Under Mississippi Code Annotated section 41-29-139, the penalty for possession of marijuana was:

> (B) Marijuana:
>
> > 1. If more than thirty (30) grams but less than two hundred fifty (250) grams, by a fine of not more than One Thousand Dollars ($1,000.00), or confinement in the county jail for not more than one (1) year, or both; or by a fine of not more than Three Thousand Dollars ($3,000.00), or imprisonment in the custody of the Department of

for burglary of a dwelling and one for felon in possession of a firearm, *id*. at 437 (¶7), Russell was sentenced under section 99-19-83 as a habitual offender and received a sentence of life in prison. *Id*. at 438 (¶15). On Russell's appeal, this Court split with a five-to-five decision, resulting in an affirmance, and the Supreme Court granted Russell's petition for writ of certiorari. *Id*. at 437 (¶10). Despite the apparent difference between the life sentence imposed and the relatively minimal sentence contained in the penalty for possession of marijuana statute, the Court noted that:

> Appropriate evidence was presented to prove, beyond a reasonable doubt, that the requirements of Section 99-19-83 had been met. . . . Because the trial judge followed the law to the letter, we affirm. The trial judge did not have sentencing discretion in this case. Mississippi Code Section 99-19-83 provided for one sentence: life without parole.

*Id*. at 438 (¶¶13-15) (paragraph numbering omitted). The Court acknowledged that "[a] sentence that is 'grossly disproportionate' to the crime committed is subject to attack on Eighth Amendment grounds applying the proportionality test from *Solem v. Helm*, 463 U.S. 277, 290-91 (1983)." *Id*. at (¶15). The Court set out the factors in *Solem* that should guide the proportionality analysis in each case: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Id*. at 438-39 (¶16). Still, "only in the exceedingly rare case" when the threshold comparison (element 1)

---

Corrections for not more than three (3) years, or both[.]

Miss. Code Ann. § 41-29-139(c)(2)(B)(1) (Rev. 2018).

leads to an inference of gross disproportionality, should the court then compare the defendant's sentence with the sentences received by other similar offenders. *Nash v. State*, 293 So. 3d 265, 269 (¶13) (Miss. 2020).

¶71. "The bigger problem we face in these cases," the *Russell* Court noted, "is the difficulty in determining what constitutes the initial inference of gross disproportionality, whether that threshold has been met and, procedurally, what to do when it has been met." *Russell,* 346 So. 3d at 440 (¶24). "The precise contours of the gross disproportionality principle are unclear." *Id*. Ultimately, the Court instructed:

> In the limited scenario in which the mandatory sentence facing a defendant under Section 99-19-83 is life without parole and the crime for which the defendant is being sentenced, unenhanced, is a nonviolent crime that carries a minimal-maximum sentence (i.e. less than ten years), trial judges should specifically consider "all matters relevant to" the sentence as contemplated in *Presley* [*v. State*, 474 So. 2d 612 (Miss. 1985),] to determine the issue of gross disproportionality and the constitutionality of the sentence as to that particular defendant.

*Id*. at 442 (¶32). Because Russell's drug possession charge was not a violent crime, the Supreme Court proceeded to examine the evidence before the court that sentenced Russell, noting that the burden was on Russell to show that the life sentence mandated by the Legislature was unconstitutional in his case. *Id*. at (¶33). The Court noted that Russell presented no evidence at the sentencing hearing, only argument. *Id*.; *see also id*. at 437 (¶7) (stating Russell merely argued the law). But the Court reviewed the record and found it "replete" with other evidence supporting the trial court's life sentence, including that Russell was a suspect in a murder case and had been identified by a witness, that Russell was arrested while law enforcement was attempting to serve another drug-related warrant on him, and that

chemical gas had to be deployed to obtain Russell's surrender. *Id*. at 442 (¶34). The Court

stated, "[I]t is unlikely that Russell would have prevailed even if he had actually presented

any evidence on his own." *Id*. The Supreme Court concluded:

> In Russell's case, the trial judge followed our procedure and the law. Russell presented no evidence related to the *Solem* factors and the trial judge sentenced Russell to the only sentence available. Therefore, we affirm.

*Id*. at 443 (¶36).

¶72. Here, Burdine was convicted of video voyeurism under Mississippi Code Annotated

section 97-29-63, which carries a penalty of a maximum of five years imprisonment or a fine,

or both.[14] Although a felony, video voyeurism is not a crime of violence listed in section 97-

7-2. However, Burdine's two prior felonies, both aggravated assault convictions, are crimes

of violence, making him a violent habitual offender that required sentencing under section

99-19-83. Although during sentencing he argued that a life sentence would be

unconstitutional, Burdine, like Russell, presented no evidence to meet his burden of proof.

The circuit court had heard the testimony at trial, seen the videos, not only of the voyeurism,

but also the videos Burdine took of the young girls when he exposed himself to them. The

court was aware that Burdine had over 100 videos of a similar nature on his phone for which

he could have been charged. Burdine's indecent exposure incidents occurred on different

---

[14] Section 97-63-2(a) provides:

> (a) Except as provided in paragraph (b) of this subsection, a person who was over the age of twenty-one (21) at the time of the offense who is convicted of a violation of subsection (1) of this section shall be punished by a fine of Five Thousand Dollars ($5,000.00) or by imprisonment of not more than five (5) years in the custody of the Department of Corrections, or both.

dates, and he was arrested at a similar time of day, cruising the same area around the school in search, it can be inferred, of another victim. From our review of the entire record before the trial court, along with the total lack of evidence presented by Burdine at sentencing and the documentation of his prior violent crimes, and being bound by Mississippi Supreme Court precedent,[15] we, like the Court in *Russell*, find the trial court sentenced Burdine to the only sentence available, and we affirm.

¶73.   Burdine argues that his life sentence is disproportional when compared to the sentence imposed in *Moore v. State*, 391 So. 3d 829 (Miss. Ct. App. 2024). There, Moore was convicted of fifteen counts of video voyeurism and one count of video voyeurism of a child, based on placing hidden cameras in an employee restroom at his business and in his home bathroom. *Id*. at 834 (¶11). The circuit court sentenced Moore to five years on each video voyeurism count and ten years on the count of video voyeurism against a minor, all to run concurrently. *Id*. at 835 (¶13). Although Burdine's sentence exceeds Moore's, Moore was not a habitual offender, so his case was not comparable to Burdine's. Moreover, before the court compares a defendant's sentence to that of a similarly situated defendant (the second element in *Solem*), the court must first find his sentence grossly disproportional, the first element in *Solem*. *See Harmelin v. Michigan*, 501 U.S. 957, 965 (1991) (holding that the *Solem* test should only apply when a comparison of the crime to the sentence leads to an inference of gross disproportionality); *Skinner*, 354 So. 3d at 337 (¶22) (stating the two other

_____

[15] As we stated in *Beckham v. Beckham*, 296 So. 3d 120, 124 n.4 (Miss. Ct. App. 2019), "[t]his Court does not have the authority to overrule or ignore Supreme Court precedent."

40

*Solem* prongs are considered if we determine the threshold requirement has been met). We have already held that Burdine failed to meet his burden of proving that his sentence was grossly disproportionate, the threshold question; therefore, we need go no further in our analysis.

### Conclusion

¶74. We hold that Burdine is procedurally barred from challenging the search warrant for the phone because he failed to put it or Pharez's affidavit in the record. We find no merit to the rest of Burdine's arguments. Accordingly, we affirm Burdine's convictions and sentences on all counts.

¶75. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**